**SIERRA CLUB, The City Club of New York, Business for Mass Transit, Committee for Better Transit, Inc., NYC Clean Air Campaign, Inc., West 12th Street Block Association, Hudson River Fishermen's Association, Hudson County Citizens for Clean Air, Seymour Durst, Otis Burger, Mary Rowe, and Howard Singer, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, John Marsh, as Secretary of the Army of the United States, Joseph K. Bratton, as Chief of Engineers, Walter M. Smith, Jr., as New York District Engineer of the United States Army Corps of Engineers, William C. Hennessy, as Commissioner of the New York State Department of Transportation, United States Department of Transportation, Andrew L. Lewis, Jr., as Secretary of Transportation of the United States, Federal Highway Administration, Raymond A. Barnhart, as Administrator of the Federal Highway Administration, the City of New York, Defendants.**

**No. 81 Civ. 3000.**

United States District Court, S. D. New York.

June 30, 1982.

---

**7.** In *Blankenship v. Secretary of Health and Human Services*, 532 F.Supp. 739 (W.D.Ky. 1982), the Secretary cast doubt on the possibility of the agency enforcing regulations previously proposed. The district court responded by holding that "it is the duty of the Secretary to publish and promulgate rules and regulations which shall provide that the maximum time between hearing requests and hearing decisions shall be 180 days, subject to exceptions which were specifically approved by the Court of Appeals for the Second Circuit in *Barnett v. Califano*, 580 F.2d 28 (1978). These exceptions are: (a) the claimant or his representative caus-es a delay by his failure to provide information essential; b) the claimant or his representative request(s) a delay; c) the claimant or his representative fails to appear for a scheduled hearing; d) other action or omission directly attributable to the claimant or his representative." This Court agrees that the defendant is bound by case law to process decisions within a reasonable time. In addition, the guidelines outlined by the district court in *Blankenship* represent a reasonable accommodation of the parties' interests and therefore should be considered by the Secretary in the resolution of this case.

**1368**

Butzel & Kass by Albert K. Butzel, Mitchell S. Bernard, New York City, for plaintiffs.

John S. Martin, Jr., U. S. Atty., by Gaines Gwathmey, III, R. Nicholas Gimbel, Asst. U. S. Attys., New York City, for U. S. Army Corps of Engineers, U. S. Dept. of Transp., and Federal Highway Admin.

Lawrence R. Liebesman, Washington, D. C., for Environmental Defense Section, Land and Natural Resources Div., U. S. Dept. of Justice.

Beveridge & Diamond by Gary H. Baise, Jonathan Z. Cannon, Charles A. Patrizia, Carl Eardley, Washington, D. C., for Com'r, Dept. of Transp., William C. Hennessy.

Frederick A. O. Schwarz, Jr., Corp. Counsel, by John C. Brennan, Asst. Corp. Counsel, New York City, for the City of New York.

GRIESA, District Judge.

On March 31, 1982 the court handed down an opinion, which dealt with the proposed "Westway" Project for the West Side of Manhattan in New York City and the related landfill in the Hudson River. In that opinion, the court held that the permit for the landfill, which had been granted by the United States Army Corps of Engineers to

the State of New York, was invalid as having been issued in violation of the requirements of federal law. The matter was remanded to the Corps for further proceedings in compliance with law.

One of the principal issues in the case was whether the Corps of Engineers had fulfilled its obligation under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, in relying on an Environmental Impact Statement issued by the Federal Highway Administration ("FHWA") and the New York State Department of Transportation ("New York State DOT") in January 1977 ("January 1977 EIS").

In the March 31, 1982 opinion the court held that, during the time the Corps of Engineers was considering the landfill permit, information was obtained by the Corps, the FHWA and the New York State DOT which demonstrated the invalidity of the statements made in the January 1977 EIS on the subject of the impact of the proposed landfill on fisheries. The court held that, since the matter of fisheries was central to the consideration of the landfill permit application, the Corps was obligated to issue an environmental impact statement disclosing the new information. The Corps did not do so. The court found that the FHWA and the New York State DOT were instrumental in persuading the Corps to withhold the fisheries information.

At the time of the trial, the New York State Commissioner of Transportation was a defendant in the case, along with the Corps of Engineers and federal officials connected with the Corps. However, the FHWA was not a defendant.

Following the March 31, 1982 opinion, plaintiffs proposed either to file a separate action against the FHWA or to amend the complaint in the present action adding a claim against the FHWA. The latter procedure has been followed. The complaint in the present action has been amended. The claim against the FHWA is that it violated NEPA.

The parties have been given an opportunity to offer additional evidence on the new claim, and the taking of this evidence has now been concluded. This opinion constitutes the court's findings of fact and conclusions of law on this matter.

The portion of the trial of this action which preceded the March 31, 1982 opinion will be referred to as "the first hearing." The portion of the trial which followed the submission of the claim against the FHWA will be referred to as "the second hearing."

Prior to the second hearing, plaintiffs moved for a preliminary injunction, seeking to restrain the State of New York from paying approximately $97 million to the City of New York for the right-of-way for the proposed landfill, and further seeking to restrain the FHWA from making a 90% reimbursement to the State for the right-of-way payment. In a bench opinion of April 20, 1982, the court granted the motion against the payment of the FHWA to New York State and denied the motion as to the payment by New York State to the City.

The City of New York intervened as a defendant in the action at the time of the preliminary injunction motion.

*Summary of Ruling*

The claim against the FHWA is that, following the issuance of the January 1977 EIS and prior to the release of major funding for Westway, certain new information became available relating to the environmental impact of Westway, including:

(a) The completion of a fishery study, which revealed that the proposed Westway landfill area is an important habitat for striped bass;

(b) The submission of comments by the National Marine Fishery Service ("NMFS"), the Fish and Wildlife Service ("FWS"), and the Environmental Protection Agency ("EPA"), taking the position that the proposed Westway landfill threatened serious adverse impact on Hudson River fisheries resources;

(c) Proposals for several new alternatives to Westway;

(d) Urban renewal in the West side area, which rendered the urban development aspects of Westway substantially less important and attractive;

(e) Increases in the costs of Westway and uncertainty of adequacy of funding; and

(f) Increases in the estimated levels of traffic and air pollution that would result from the construction and operation of Westway.

The claim is that the new information rendered the January 1977 EIS incorrect and incomplete, and that a supplemental environmental impact statement was required pursuant to applicable regulations. No such supplemental statement was issued.

With regard to the issue of impact on fisheries, plaintiffs claim that even before the new fishery study was carried out, and indeed at the time the January 1977 EIS was issued, the authors of this EIS knew, or should have known, that the material in the EIS on fisheries was incorrect.

The court finds that plaintiffs have not made out a case against the FHWA regarding the need for supplementation as to items (c)–(f) above. The court finds, however, that the information in the January 1977 EIS regarding fisheries was untrue. The authors of the EIS knew, or should have known, that they had no basis for the presentation made on this subject. Subsequently, when the data from the fishery study became available, this data demonstrated positively the falsity of the EIS on the subject of fisheries. The FHWA was under a duty to file a supplemental environmental impact statement setting forth the facts. The FHWA wilfully refused to take the necessary corrective action.

The evidence at the second hearing not only demonstrated the failure of the FHWA to fulfill its own obligations under NEPA, but also reinforced the evidence presented at the first hearing to the effect that the FHWA and the New York State DOT colluded in a successful effort to persuade the Corps of Engineers to refrain from issuing an environmental impact statement in connection with the landfill application.

Since the FHWA has failed to comply with NEPA, the FHWA must be enjoined against making any further payments for, or taking any further steps toward, the construction of Westway, except as specifically approved by the court. The matter must be remanded to the FHWA for further proceedings in compliance with the law.

*Findings of Fact*

*Agencies Involved*

The principal responsibility within the FHWA for the Westway project rests with that agency's New York Division. The Division Administrator is Victor Taylor. The FHA official directly responsible for the Westway project is Graham Bailey, who carries the title of Area Engineer. Both Taylor and Bailey testified at the second hearing. Another witness from the FHWA at the second hearing was Fred Bank, an ecologist based in Washington.

The FHWA has worked closely on Westway with the New York State DOT, headed by William Hennessy, the Commissioner. Commencing in 1972 an administrative entity known as the "West Side Highway Project" was formed under the jurisdiction of the New York State DOT. This entity will be referred to hereafter as "the Project" or "the Westway Project." The Project was made up almost entirely of outside consulting firms. The chief of these firms was Systems Design Concept, Inc. ("Sydec"). Lowell K. Bridwell, the principal of Sydec, was the Executive Director of the Project from 1972 until 1981, when he resigned to take an official post with the State of Maryland. In 1981, the FHWA requested that the administration of the Westway project be placed in the hands of state employees. Consequently, a state employee, Michael Cuddy, became Project Director in March of that year, succeeding Bridwell. Sydec and other outside consulting firms continue to be employed for various purposes. Bridwell and Cuddy testified at the second hearing.

Under the provisions of NEPA, where the federal action involves a grant of funds to a state, the necessary environmental impact

statement may be prepared by a state agency, so long as the responsible federal official ensures that the scope, objectivity and content of the statement are proper. 42 U.S.C. § 4332(2)(D).

The January 1977 EIS was signed by both the FHWA and the New York State DOT. The actual drafting was done by Sydec, which had, among its various responsibilities, the duty to handle compliance with the environmental laws.

Sydec also had the principal responsibility for dealing with the application to the Corps of Engineers for the landfill permit. An employee of Sydec by the name of Joan Walter was heavily involved in the matter of the landfill application to the Corps from the time it was filed in April 1977, and was also involved thereafter in all aspects of the aquatic impact question relating to Westway. Walter testified at the second hearing.

*The January 1977 EIS*

█ The March 31, 1982 opinion summarizes (pp. 43–44) the portions of the January 1977 EIS relating to the subject of fisheries. There is also a summary (pp. 44–46) of the document known as the Technical Report on Water Quality ("TRWQ"), which contains material on fisheries and which was deemed to be a part of the January 1977 EIS. The January 1977 EIS and the TRWQ developed in some detail the thesis that the area of the Hudson River proposed for the landfill (called the "interpier area") is so polluted and is subject to such rapid fluctuations of temperature and salinity that it cannot be used or inhabited by fish except to the most minimal extent. The January 1977 EIS contrasted the productive areas of the Hudson Estuary with the biologically barren interpier area. The EIS described the essential role of normal, productive estuary waters in fulfilling the needs of migratory fish, including providing nursery areas for certain species and offering winter protection for other species, such as striped bass. The interpier area was said to play no such estuarine role. The interpier area was described as a "biological wasteland" in the TRWQ. The TRWQ and the EIS described the interpier area as "almost devoid of micro-organisms" [which would include fish] and as "biologically impoverished." The EIS concluded that, in view of these circumstances, the landfill would cause a "minimal loss of estuarine productivity for species other than micro-organisms" [those which can only be observed through a microscope], and would "have little impact on the overall productivity of the Hudson Estuary."

The January 1977 EIS argued that the river conditions along the new landfill shoreline would have basically the same characteristics as now occur in the main channel. Moreover, with improved sewage treatment, this area of the river would be a more attractive fish habitat in the future. The "riprap" edge of the landfill would provide dwelling areas attractive to fish and forms of life furnishing food for fish. Thus the argument was that the landfill would merely eliminate an "impoverished" area, leaving a main channel environment which would be beneficial to fish.

Plaintiffs contend that the information existing at the time the January 1977 EIS was issued provided no basis for the categorical assertions about the absence of fish in the interpier area. The main focus of the litigation has been on the issue of whether results of the later fish study, completed in 1980, were such as to require supplementation of the January 1977 EIS. However, the question of whether the 1977 EIS was adequate as of the time of its issuance must be dealt with. The court finds that the FHWA and the New York State DOT lacked a sufficient basis for making the assertions on the subject of fishery impact which are contained in the 1977 EIS. Bridwell and Walter from the Project, and Bank from the FHWA, have all testified that, prior to the receipt of the results of the new fisheries study, they realized that the sampling which had been carried out in preparation for the January 1977 EIS was inadequate. They have admitted knowing that the reason the earlier study revealed virtually no fish in the interpier area was that the study was made at a

time of year which was not representative and the sampling techniques were faulty. The court concludes that those responsible for preparing the fishery material in the January 1977 EIS knew, or should have known, of the lack of factual basis for what was stated.

This does not mean that, as of 1977, there was any substantial body of information positively indicating that the interpier area was a fish habitat. The point is that the January 1977 EIS categorically asserted the opposite. There was no basis for such a presentation.

*Activities Regarding New Study*

On January 4, 1977 the FHWA and the United States Department of Transportation approved federal funding for Westway. Location and design approvals were granted by the FHWA on March 16, 1977 and July 25, 1977 respectively.

The New York State DOT filed the landfill application with the Corps of Engineers in April 1977.

In late 1978, EPA prevailed upon the New York State DOT to have a new fisheries study performed. The decision in favor of this new study was actually made by Hennessy, over the objection of Bridwell. The firm of Lawler Matusky & Skelly ("LMS") was commissioned to carry out the study. Their work commenced in April 1979.

LMS carried out their sampling work each month commencing in April 1979 and continuing through April 1980. LMS reported the results of the sampling to Walter and Bridwell on a regular basis. Walter relayed general information about the results to representatives of the FHWA and the Corps of Engineers. A so-called "Progress Report" was issued by LMS in May 1980, which contained the sampling results through November 1979. The final LMS report dealing with the entire 13-month sampling was issued in two phases— Volume I appearing in September 1980, and Volume II in November 1980. Vol. I dealt with the numbers of fish caught at the various locations. Vol. II contained additional technical information of no great significance to the issues in this case.

Witnesses from the Project and the FHWA testified at length in the second hearing about the LMS study. According to the Project and FHWA testimony, the information from the LMS report was received as an entirely routine matter and was the subject of no concern, since it indicated no significant environmental impact. According to Bailey of the FHWA, the difference between the LMS data and the earlier information was a mere "data discrepancy," which did not relate to an environmental impact because "the fish had elsewhere to go" (Tr. 176–77). The latter conclusion was said to be demonstrated by the LMS report. On the question of whether to correct or supplement the January 1977 EIS, the testimony was that the LMS report led to the same conclusion as had been stated in the EIS—that the landfill would have little impact on the overall productivity of the Hudson estuary. Therefore the Project and the FHWA maintain that they acted reasonably and in good faith in deciding that they need not issue a corrected or supplemental EIS, and that they were justified in advising the Corps of Engineers that the Corps should not issue any environmental impact statement in connection with the landfill permit application.

The court has considered this testimony carefully in light of all the evidence, and is compelled to find that its essential features cannot be credited. In connection with the three principal defense witnesses—Bailey, Bridwell and Walter—it is apparent that they have not disclosed the facts in a full and candid fashion. The testimony of these witnesses was characterized not only by a striking lack of plausibility on critical points, but also by a remarkable amount of inconsistency, evasion, and asserted loss of memory on matters where memory would be expected.

The following is a summary of the findings of the court regarding the LMS study, and the manner in which the Project and the FHWA dealt with it. The LMS information, as gradually obtained by the

Project and the FHWA over a period of many months, was of acute concern because it was totally at variance with what had been set forth in the January 1977 EIS and because it showed that the landfill would eliminate a highly productive fisheries habitat. The Project and the FHWA responded to this circumstance with a plan to delay issuance of the report by LMS, and to manipulate the presentation of this data in order to mask its full import. The LMS report was carefully constructed so as to seriously misrepresent the information about striped bass. The decision of the Project and the FHWA not to issue a corrective or supplemental EIS was not taken in good faith reliance upon expert judgment, but was designed to avoid public disclosure of a major environmental impact. The FHWA's written statement to the Corps of Engineers, about the lack of necessity for an environmental impact statement regarding the landfill permit application, was a misrepresentation of the facts.

Certain details of the evidence underlying these findings are as follows. In late 1979 and early 1980 the Corps of Engineers made requests to the Project for the LMS sampling data which was being obtained. This was at a time when each new step in the LMS study was demonstrating the great abundance of various species of fish, particularly striped bass, in the interpier area. Bridwell declined to furnish the data to the Corps, on the ground that the Corps might need to reveal it under the Freedom of Information Act. It is clear that Bridwell sought to delay production of the fisheries information, and further sought to produce it only in a form which suited the purposes of the Project.

Bridwell promised the Corps that the report to be issued by LMS would be furnished in June 1980. However, it is apparent that LMS and the Project were having some difficulty in determining how to deal with the LMS data which was being generated. Consequently, a "Progress Report" was issued in May 1980, which contained the results only through November 1979. The Progress Report did not include the most crucial data and represented an obvious delaying tactic.

The details of the data generated from the full LMS study are described in the March 31, 1982 opinion of this court at pp. 62–75. The LMS data unquestionably showed the interpier area to be a productive and important habitat for several species of fish. With respect to striped bass, the data showed that there were large concentrations of juvenile striped bass which were overwintering in the interpier area. In order to determine the relative importance of the interpier area as a habitat for striped bass, samples had been taken at eleven "Exploratory Striped Bass Stations" in February 1980, in addition to the seventeen other stations sampled. The stations involved in this February sampling ranged from the Lower Bay (south of the Verrazano Narrows Bridge) as far north as Haverstraw Bay. The data collected from the various samplings showed that the concentration of striped bass in the interpier area was far greater than in the other stations which were sampled.

After the interpier area, the greatest abundance was at a comparable New Jersey shore area across the Hudson River, but even there the number taken was only one-third of what was found in the interpier area. In four stations the numbers found ranged from about one-seventh to about one quarter of the numbers found in the interpier area. In the remaining twenty-one stations the numbers of striped bass found were either zero or minimal.

This data could hardly have offered a more striking contrast to what had been presented in the January 1977 EIS. The EIS spoke, among other things, of the important function of a *normal* estuary such as the Hudson River in offering winter protection for species such as striped bass, but stated flatly that the interpier area did not, and could not, play any such role.

Bridwell and Walter were kept continually informed by LMS of the main features of the findings. Walter passed a certain amount of information on to Bailey at the FHWA, although there is some disagree-

ment in the testimony about the extent of this. Also, Walter informed Linda Monte, a biologist at the Corps of Engineers, to a certain extent of what LMS was finding.

As described in the March 31, 1982 opinion of this court, the District Engineer had recommended issuance of the landfill permit in the fall of 1979, and thereafter the matter was before the Division Engineer for review. Allegedly the Division Engineer was waiting for the LMS report in order to make his decision.

The testimony of Bridwell and Walter is that in mid-August 1980 the Corps of Engineers requested a meeting with the Project and the FHWA to discuss "mitigation" measures to be taken in connection with the proposed landfill. Bridwell testified that he did not know why the Corps made this request. Bailey of the FHWA recalls that there was some discussion leading up to the meeting with the Corps, but he cannot recall anything that was said.

Of course, the consideration of mitigation measures in August 1980 did not occur in a vacuum. It is clear, from the evidence as a whole, that in the summer of 1980 the Project and the FHWA were doing far more than waiting for the LMS report, which would then be submitted to the Corps of Engineers for its objective analysis. The Project and FHWA officials fully realized that the new fisheries data showed that the proposed landfill would eliminate a significant fishery habitat in the Hudson estuary. The Project and FHWA officials realized that this data vindicated the concerns of EPA, NMFS and FWS and posed problems in justifying the landfill permit. The Project devised a strategy to deal with this problem. The Project gave the Division Engineer's office some information, although not complete information, about the results of the LMS study. The Division Engineer's decision in favor of the landfill permit was apparently considered to be a foregone conclusion. It was agreed among the Project, the FHWA and the Corps that, in order to make the issuance of the landfill permit "more defensible" (Pl. Ex. 74), and to defuse the opposition as much as possible,

mitigation concepts would be worked out to attempt to compensate for the loss of fish habitat. There would then be an attempt to make mitigation the "focal point" of the discussion with the other federal agencies, rather than the LMS report itself (Pl. Ex. 73).

On or about August 7, 1980 the Project received a draft of Volume I of the LMS report. The Project gave the draft to the New York State DOT and the FHWA for review. It contained the main features of the final Vol. I, which was issued on September 8, 1980.

On August 13, 1980 a meeting was held, attended by representatives of the Project, the FHWA and the Corps. Although the Project and the FHWA had received the draft of Vol. I of the LMS report, this document was not present at the meeting. The LMS information was discussed only in a broad sense. The focus of the meeting was on mitigation measures. It was agreed that the Project would develop mitigation concepts and that the FHWA would consider funding the cost of mitigation.

On August 20, 1980 there was a meeting of representatives of the Project and the FHWA. Also in attendance were representatives of LMS. No one from the Corps was present. The purpose was to discuss the mitigation concepts, and to persuade the FHWA to provide the necessary funding.

At this private meeting, the discussion of the LMS fisheries data and the impact of the proposed landfill was in far different terms from the positions which were later taken officially by the Project and the FHWA. At this meeting, the Project representatives, seconded by LMS, told the FHWA that the LMS study indicated that the landfill could cause significant loss of fish population and subsequent adverse effects on the level of future stocks of the species in question in the lower Hudson area. Also, there was a description of the current understandings with the Corps of Engineers.

All this is reflected in two contemporaneous memoranda of the meeting made by

Fred Bank and Charles L. O'Donnell of the FHWA. The pertinent portions of these memoranda are quoted below. Since it will be necessary to discuss in some detail the testimony about these memoranda, numbers for the sentences have been inserted in the quotations. The Bank memorandum (Pl. Ex. 76) reads in pertinent part as follows:

"[1] The question of whether mitigation proposals were necessary was answered by project officials using the results of the recently completed fish study and information received from the Corps of Engineers. [2] The fish study demonstrated that the area of the Hudson River to be filled by the project provides habitat as an overwintering nursery area for the young of several fish species. [3] In particular, Striped Bass, Winter Flounder, and White Perch were found to be using the interpier area rather extensively. [4] The project fill would remove roughly ½ of this available habitat and the present piers. [5] A stone bulkhead would be constructed on the fill slope. [6] Thus the area of protected, low velocity waters would become open to river and tidal currents. [7] The resulting habitat changes would not be conducive to the present species requirements for a food supply in the bottom muds and protection from swift currents. [8] It was felt that the potential loss could be significant in terms of direct population losses and subsequent adverse effects on the level of future stocks of the species in question for the lower Hudson area."

The O'Donnell memorandum (Pl. Ex. 74) reads in pertinent part:

"[1] The Corps is anxious to act on the permit as soon as possible after the indirect source permit[1] is issued, and has established a date of September 8 for forwarding the Section 404 permit application to the Washington Office. [2] The Corps, however, anticipates that the U. S. Fish and Wildlife Service will apply pressure to provide mitigation in the interpier area of the channel to offset the construction impacts. [3] In addition to the loss of channel bottom area due to the placement of the Westway fill, the vertical stoneface on the streamward edge of the fill in the interpier area is considered an unfavorable environment for supporting fish life. [4] A recent fish biology study has revealed that fish have been found in this area in much greater numbers than original studies indicated. [5] Also, according to this study, the interpier area is functioning as a nursery for various species of fish which feed on organisms that inhabit the river bottom. [6] The Corps' New York District Office[2] believes that their position in support of the permit would be more defensible and greatly strengthened if their submission to the Chief of Engineers includes conceptual plans for providing mitigation. [7] The alternative of providing no mitigation is unacceptable to the Corps."

There is conflicting testimony regarding the accuracy of the Bank and O'Donnell memoranda about the August 20 meeting. Bank testified at the second hearing and affirmed the accuracy of his memorandum, with the qualification that the statements attributed to "project officials" may have been made in part by an LMS spokesman. O'Donnell did not testify at the second hearing. However, Bailey testified that he read the O'Donnell memorandum at the time it was circulated, and initialed it.

Bridwell and Walter contended in their testimony that parts of these memoranda were inaccurate. With regard to the Bank memorandum, Bridwell admitted the accuracy of sentences [1]–[6]; as to sentence [7], he testified that the Project did not make this statement, and he could not recall whether it was made by LMS. Bridwell denied that sentence [8] was stated by either the Project or LMS. Thus Bridwell

---

1. This is a permit issued by the New York Department of Environmental Conservation. It was apparently expected that this permit would be issued prior to September 8, 1980. It was not, in fact, issued until October 30, 1980.

2. The reference to the District Office was in error. The reference should have been to the Division Office.

denied that the Project or LMS made the crucial statement about fishery population losses and adverse effects on the level of Hudson River stock. Bridwell testified that, while he did not have a definite recollection, such a statement may have been made as representing the views of certain critics of the project.

Walter admitted that sentence [1] of the Bank memorandum was accurate. As to sentence [2], she admitted that the statement was made about the Project area being an overwintering habitat for several species, but denied that the word "nursery" was used, except for some discussion of bay anchovy, the eggs and larvae of which were found in the interpier area and elsewhere. Walter admitted the basic accuracy of sentences [3]–[6]. As to sentence [7], dealing with the loss of favorable habitat, she admitted this was stated, but testified that the LMS representative further stated in effect that this loss could be remedied by mitigation, and that, in any event, the fish would be assimilated in other parts of the river and that there would not be direct population losses resulting from the construction of Westway. Walter stated that the material in sentence [8] was presented only as representing the possible contentions of the federal agencies opposed to the Project.

With regard to the O'Donnell memorandum, Bridwell denied that the statements made in the sentences [1], [3] and [5] were made. Walter denied everything except for sentence [4].

The testimony of Bridwell and Walter is entirely unconvincing. The suggestion of inaccuracies is nothing but an attempt to eliminate those points which are unfavorable to the defense position in this litigation and to add material which would support that position. There is no reason to believe that the Bank and O'Donnell memoranda were incorrect in such an oddly selective fashion. The court credits these memoranda as accurately reflecting the discussion at the August 20 meeting on the subjects covered by them.

The evidence about the August 20 meeting demonstrates that both the Project and LMS were fully aware that the proposed landfill would have an environmental impact of substantial significance. As they recognized, the new fisheries data showed the significance of the interpier area as a fish habitat, particularly as an overwintering habitat for the young of several species. The proposed landfill, in eliminating this habitat, presented the risk of "direct population losses" in terms of loss of fish which would use the interpier area, and also the risk of adverse effects on the level of future fishery stocks in the Hudson River. All of this was communicated to the FHWA.

The problem of mitigation, which was discussed at the August 20 meeting, was one of considerable difficulty. Prior to the LMS study, the theory had been that the waters of the main channel offered the only suitable environment for fish in this area, because of the main channel's water quality and its temperature and salinity patterns, in contrast to the totally unfavorable characteristics of the interpier area. It was thought that the riprap or broken stone edge of the landfill would compliment the environment of the main channel waters. This was the presentation of the January 1977 EIS.

The LMS data destroyed this theory. It showed that the interpier area was a far more desirable habitat for fish than the main channel. The information demonstrated that the riprap edge of the landfill would in no way provide the kind of habitat lost to the landfill, nor would it offer substantial mitigation.

The mitigation measures discussed at the August 20 meeting included constructing subsurface jetties and groins and leaving portions of the existing piers intact. The intention was to attempt to develop measures which would slow the current, permit siltation, and otherwise partially duplicate the type of habitat which would be lost to the landfill. The area available for the mitigation measures was the rather narrow space remaining between the edge of the landfill and the pierhead line. No defini-

tive conclusions on mitigation were reached at the August 20 meeting. Indeed, no mitigation design has ever been finally agreed upon, even as of the present time.

On August 21, 1980 Bridwell wrote Major General Lewis, the Division Engineer, stating that Vol. I of the LMS report would be presented on September 8th.

On September 8, 1980 Vol. I of the LMS report was released to the Corps of Engineers and also to EPA, NMFS and FWS. In the March 31, 1982 opinion, this court found that the LMS report was incomplete and misleading in its treatment of the data regarding striped bass. The seriousness of the misrepresentation has become even clearer in the second hearing.

Perhaps the most important information resulting from the LMS study related to the finding of large concentrations of juvenile striped bass overwintering in the interpier area, and the further finding that much lesser or minimal numbers of striped bass were found in other locations over a wide area of the Hudson River. It goes without saying that this state of affairs should have been described fully and accurately in the LMS report. It was not. The failure to do so did not happen by accident. There was clearly an effort to present material on striped bass in the LMS report, which would appear to cover the subject, but which would in fact avoid the important points.

The bar graph in the LMS report purporting to compare the abundance of striped bass in the interpier area and in other sites was distorted by certain improper averaging that minimized what was shown for the interpier area in relation to the other sites (p. 4.0–14). Moreover, in the text of the report there was *no description whatever* of the relative concentrations of striped bass found in the interpier area as compared with the other sites. It should be noted that there was such a description with regard to winter flounder (p. 4.0–15), which were found in greater abundance outside the interpier area. Obviously the winter flounder information was to the liking of the Project, whereas the facts about striped bass were not.

The conclusion regarding striped bass contained the following language (p. 4.0–17):

"For the striped bass population, the project area appears to represent one of many available habitats...."

This statement was obviously drafted to give the impression that there are many habitats for striped bass of more-or-less equal importance. However, this statement omitted the important point—*i.e.*, that the data showed a great disparity in the abundance of striped bass in the various areas, with the interpier area having by far the greatest concentration.

The substance and tone of the LMS report were entirely different from what was expressed privately by the Project and LMS at the meeting on August 20. There was no hint in the report of a potential loss of fishery habitat which "could be significant in terms of direct population losses and subsequent adverse effects on the level of future stocks."

Bridwell and Walter deny any role in drafting or directing the drafting of the aspects of the LMS report here criticized. They assert that the contents of the report, aside from minor editorial changes, were solely the responsibility of LMS—particularly a former employee of that firm, Carter Braxton Dew. Although Dew was questioned in a general way about his authorship of the LMS report at the first hearing, he was not called at the second hearing when the issue about responsibility for the LMS report was probed in greater detail. He is in Alaska.

The court finds that, even if they played no role in the drafting of the LMS report, Bridwell and Walter knew about the misleading nature of the report at the time it was issued.

The attorneys for New York State and for the Federal Government have now virtually conceded that the LMS report omitted relevant information and analysis. They argue, however, that no one was deceived. They urge that the persons who

reviewed the LMS report at the Corps of Engineers and the other federal agencies had sufficient expertise to put the various parts of the LMS report together and discern the basic facts. To some extent this is true, as the court found in the March 31, 1982 opinion. However, this is hardly a justification for the deliberate manipulation of the facts in the LMS report. At the very least, the method of presentation in that report created a facade which could be used officially by the Project, the FHWA and the Corps of Engineers to justify their various actions which are now in question. Moreover, the spurious conclusions in the LMS report about striped bass have been referred to over and over again by defendants and their witnesses in this litigation to support positions taken by them.

A meeting was held on September 8, 1980. The meeting was attended by representatives of the Project, LMS, the FHWA, the Corps of Engineers, EPA, NMFS and FWS. Vol. I of the LMS report was given at that time to the Corps, EPA, NMFS and FWS.

The discussion at the meeting was basically limited to mitigation. There was no meaningful consultation with the EPA and the federal fisheries agencies on the significance of the LMS data and on the question of the value of the fisheries habitat which would be eliminated by the landfill. A representative of the Corps of Engineers stated that the agencies should assume that the highway location was fixed and limit their consideration to what mitigation they would recommend.

As already noted, the Project and LMS had expressed privately to the FHWA, at the August 20 meeting, their views about the loss of fisheries habitat, potential fisheries population losses, and adverse effects on the future level of striped bass and other stocks. These views were *not expressed* at the September 8th meeting. An entirely different face was presented. When representatives of NMFS and FWS attempted to discuss the significant effect of the landfill on the fisheries habitat, the LMS representative asked what was the significant effect

they were referring to. The representatives of the Project and LMS denied any such effect.

*The Question of Supplementing the 1977 EIS*

The FHWA and the Project were well aware that the LMS data raised the issue of whether a supplemental environmental impact statement was required to correct or augment what had been stated in the January 1977 EIS on the subject of fisheries. Undoubtedly this issue received considerable attention in the summer and fall of 1980. There was also the question of whether the Corps of Engineers would insist on an environmental impact statement in connection with the landfill permit application.

It will be recalled that the consulting firm Sydec drafted the January 1977 EIS, and had a broad responsibility with regard to environmental matters. Walter of Sydec monitored the LMS study under the direction of her superior, Bridwell.

It would be reasonable to assume that Bridwell and Walter would make a recommendation to the FHWA on whether to issue a supplemental EIS. However, according to their testimony, this did not occur. Walter testified that she briefed Bridwell in preparation for a meeting he had with Commissioner Hennessy of the State DOT and Taylor of the FHWA. Bridwell testified that this meeting occurred in August or September 1980, and that he merely presented the pros and cons of supplementation. His testimony is that he indicated that supplementation would be the "safer course of action" (Tr. 1117). But Bridwell denies making any definite recommendation one way or the other.

Hennessy did not testify. Taylor, who had the responsibility for making the decision on supplementation, testified that he relied on the recommendation of his subordinate, Bailey.

Bailey's testimony is wholly unsatisfactory on the question. Bailey testified that he relied on the LMS report. Then he testified that he did not have sufficient

expertise to make a decision and relied on the FHWA "biologists." Presumably Bailey was referring to the FHWA ecologist, Bank. Bank testified on direct examination that he was consulted by Bailey after the receipt of the LMS report, and told Bailey that the report indicated that there would probably not be a significant environmental impact from the proposed landfill. However, Bank testified on cross-examination that the issues raised by the LMS report were the kind which should be explored in an environmental impact statement, but that he was not asked for his views on whether there should be a supplemental EIS.

Bailey was asked whether he consulted an attorney. At first he testified he did so. Later he testified that he could not remember whether he consulted with an attorney, but that he may have talked with certain non-attorneys at the Regional Office of the FHWA, who may have talked to attorneys. Bailey testified that he discussed the question of supplementation with the New York State DOT or the Project, but could not remember whom he talked to or when.

From the evidence as a whole, of which this summary is a capsule, the court concludes that the decision of the FHWA not to file a supplemental EIS came about in a manner which none of the witnesses was willing to admit. This conclusion is fortified by the evidence regarding a letter dated October 9, 1980 in which the FHWA formally advised the Corps of Engineers of the FHWA's view that an environmental impact statement was not required in connection with the landfill permit application.

The evidence about the October 9, 1980 letter is nothing short of bizarre. The background of the letter is as follows. Butzel & Kass, attorneys for the Sierra Club, wrote the Corps of Engineers on August 12 requesting that the Corps file an environmental impact statement in light of certain recent developments, including the new fish study. Butzel & Kass had obtained a copy of the LMS Progress Report. On August 26th the Corps sent the Butzel & Kass letter to the FHWA asking for the FHWA's

views. In addition, the EPA wrote to the FHWA on August 28th referring to the Progress Report as contradicting the 1977 EIS, and raising various objections to the Westway project.

The October 9, 1980 letter from the FHWA to the Corps (Pl. Ex. 69) contained comments on both the Butzel & Kass letter and the EPA letter. Beyond this, it dealt with Vol. I of the final LMS Report (not merely the Progress Report, referred to by Butzel & Kass and the EPA), and represented to the Corps that there was nothing in the LMS report which necessitated a new or supplemental EIS. This representation was contained in what was labeled "Attachment 2, par. A" to the October 9, 1980 letter, which stated in pertinent part:

"It must be remembered that the EIS beginning on page 240, and in its 'Water Quality Technical Report', fully addresses future water quality conditions. It explicitly noted that a variety of species use the Project area and that construction of the Project would fill an area which was either in use or could be projected to be used by some species if the quality of the river were improved. The more recent data, although to some degree providing better quantification of the species using the area, and providing further information on ways in which the impact of filling the interpier area might be mitigated, does not change the basic conclusion, that is, fish use the area; the Project will have some impact on benthos, fish and other aquatic life; and therefore may have some long-term impact on the possibility of returning the 234 acres area to a more viable habitat."

The nub of the quoted language is that the "recent data ... does not change the basic conclusion [of the 1977 EIS], that is, fish use the area." This statement, and indeed the entire description relating to fisheries, was simply fraudulent.

The January 1977 EIS and the LMS data have already been described, both in the March 31, 1982 opinion, and in this opinion. The 1977 EIS and the underlying TRWQ spoke of the interpier area as a "biological

wasteland" and as "biologically impoverished." The thesis was that no fish in any meaningful quantity could, or did, exist in the interpier area. The TRWQ made certain references to possible minimal and transitory use of the interpier area by fish, but failed to give any statistics, resulting from a May-June 1973 sampling effort, except to refer to the fact that a total of six tomcod were "taken or observed" at eight stations during the sampling. Neither the TRWQ nor the EIS referred to the presence of striped bass in the interpier area. The contrast between this presentation and the data obtained from the LMS study was enormous. The LMS data showed not only large concentrations of fish in the interpier area, but showed the function of the site as an important overwintering habitat for juvenile fish, particularly striped bass. There is no conceivable justification for saying that both the 1977 EIS and the LMS data could be summed up in the statement, "fish use the area."

For obvious reasons the witnesses were reluctant to acknowledge responsibility for Attachment 2 to the October 9, 1980 letter. The letter was signed by Taylor, but Taylor testified that it was drafted by Bailey. Bailey, in the first day of his testimony, stated four times that Attachment 2 was drafted by the State DOT or its consultants. The next day he changed his testimony, and stated that he himself drafted Attachment 2—that it was his language, although information was provided by the Project staff. He explained this change of testimony by saying that he had been told by Walter between court sessions that she had no record of preparing Attachment 2.

Bridwell testified that he did not draft or approve Attachment 2, but that Walter may have assisted in providing information.

After Bailey and Bridwell had finished their testimony, the attorney for the FHWA advised the court that a letter had been found, which showed that the State DOT sent the wording for the relevant portion of Attachment 2 to Bailey. This was a letter dated September 18, 1980 to Bailey from one Harry Dickenson, an employee of the State DOT, with the title of Project Administrator for Westway. Dickenson has not been referred to in the evidence except in connection with this letter. Obviously he was merely passing on to Bailey the wording which had been written by someone else.

Walter, who drafted two other attachments enclosed with the October 9, 1980 letter, testified that she did not draft Attachment 2. She testified that she never saw the Dickenson letter or the draft material attached to it, and did not see Attachment 2 until she received a copy of the final October 9, 1980 letter several days after it was sent.

The net effect of the testimony about authorship of Attachment 2 was as follows. Bailey testified first that the State DOT drafted it. Later he testified that he drafted it. Then a document emerged which showed that Bailey could not have drafted it, but that it came from the State DOT. No one from the State DOT or the Project admitted drafting Attachment 2.

Certain further facts came to light after the conclusion of the trial. The presentation of evidence was completed on June 8, 1982. Oral argument was completed on June 11th. On June 18th, Gary Baise, Esq., of Beveridge & Diamond, notified the court of additional information regarding the source of Attachment 2. Beveridge & Diamond are trial counsel in the litigation for the New York State DOT, and also represented the DOT in 1980 in connection with certain matters regarding Westway. Baise advised the court that, following the completion of the trial, Walter found a memorandum from Beveridge & Diamond dated September 3, 1980 in a "privileged file." The memorandum, sixteen pages long, was addressed to Bridwell and dealt with the question of whether a supplemental EIS was required because of various developments which had occurred since the time of the 1977 EIS, including the LMS fish study. The memorandum stated that no supplemental EIS was required. In addition, the memorandum contained certain of the language which found its way into Attachment 2, including the following:

"The more recent data, although to some degree providing better quantification of the species using the area, and providing further information on ways in which the impact of filling the interpier area might be mitigated, does not change the basic conclusion—fish use the area, the project will have some impact on benthos and fish, and therefore may have some impact longer term on the possibility of returning the interpier area to a more viable habitat over the long term."

Baise further informed the court that Walter advised him that she had a lengthy telephone conversation with an attorney at Beveridge & Diamond on September 17, 1980, the day before the September 18th letter of Dickenson, and met with representatives of the FHWA and the State DOT that day.

The September 3, 1980 Beveridge & Diamond memorandum has been produced to the court and to the other parties; and it is agreed that it is part of the evidence in the case. It is further agreed that the statements of Baise are to be considered as evidence. No party has requested a reopening of the case to examine Walter or any other witness further.

From all of this, the court reaches the following conclusions regarding the October 9, 1980 letter. As already stated, the representations on the subject of fisheries in Attachment 2 were false. Despite her denials at the trial, it is now clear that Walter participated in the drafting of Attachment 2, for use by the FHWA. To the extent that she used language from the Beveridge & Diamond memorandum, it was she who made or approved the selection in preparing the full draft for the FHWA. It is difficult to believe that Bridwell did not know of what was being given to the FHWA on this important matter, particularly in view of the fact that the Beveridge & Diamond memorandum was addressed to him. In any event, Bridwell received a copy of the October 9, 1980 letter after it was sent, and read it. The court finds that both Bridwell and Walter knew of the obvious falsity of the letter, and bear a responsibility for drafting or failing to correct it.

The fact that certain language in Attachment 2 originated with, or passed through, Beveridge & Diamond, does not alter the fallacious nature of that material. There is no evidence as to what facts were given to Beveridge & Diamond, and there is some doubt, based upon the contents of the memorandum, as to the precise purpose it was intended to serve. In any event, the court is compelled to say that it sees no justification whatever for Beveridge & Diamond setting forth a statement of facts which was so divorced from the truth.

Due to the importance of the issues involved and the nature of the court's findings, the evidence has been set forth at considerable length.

It is apparent that the FHWA and the New York State DOT had a joint responsibility for making necessary correction or supplementation to the January 1977 EIS. The 1977 EIS had been issued by the FHWA and the DOT. In exercising its responsibilities on the matters at issue, the DOT relied on the Project staff.

The court finds that the FHWA and the Project did not act on a reasonable basis or in good faith in failing to correct and supplement the January 1977 EIS on the subject of fisheries. The court finds that the FHWA and the Project refrained from issuing a supplemental EIS, not because the new fisheries information was insignificant, but because the information revealed a highly significant environmental impact which they wished to avoid disclosing. Moreover, the activities of the FHWA and the Project were wholly improper in influencing the Corps of Engineers, and colluding with the Corps, for the purpose of avoiding the issuance of an environmental impact statement in connection with the landfill permit application.

*Miscellaneous Factual Points*

The evidence at the second hearing dealt with certain other matters, which will not be discussed in detail.

There was considerable testimony regarding a so-called "Reevaluation" issued by the

FHWA and the State DOT in 1981. This document purported to review in detail the question of whether to supplement the January 1977 EIS. The conclusion was that no supplementation was necessary. However, on the question of fisheries, the decision not to supplement had been made in the summer and fall of 1980. The Reevaluation was merely a confirmation of that decision. The discussion in the Reevaluation followed the pattern of the earlier documents in presenting a wholly misleading discussion of the fisheries issue.

There was testimony about Vol. II of the LMS report, which appeared in November 1980. Certain of the defense witnesses indicated that the material in Vol. II regarding the food supply in the interpier area and the sheltered conditions of that area supported the view that the LMS data revealed no environmental impact worth describing in a supplemental EIS. The court has considered this contention and finds that it has no merit.

*Acquisition of Right-of-Way*

On September 8, 1981 the FHWA approved the taking of the right-of-way for the proposed landfill. The right-of-way was to be taken by the State of New York from the City of New York. The projected cost was approximately $100 million to be paid by the State to the City, 90% of which would be reimbursed by the FHWA.

The New York State DOT filed the necessary maps, which effected the formal taking, on September 11, 1981. Thereafter, the City and the State negotiated about the exact amount to be paid. At about the end of March 1982 an agreement was reached for the payment of approximately $97 million by the State to the City, with the City reserving the right to claim an additional amount in the New York Court of Claims.

On April 20, 1982, the court granted a motion for a preliminary injunction against federal reimbursement by the FHWA for the acquisition of the right-of-way. The preliminary injunction was entered on May 14, 1982. Although the preliminary injunction did not prohibit payment by the State to the City, no such payment has actually been made.

Now that the claim against the FHWA has been tried, there is the issue as to whether a final injunction should be granted. This matter will be dealt with hereafter.

*Conclusions of Law*

■ The March 31, 1982 opinion contains a discussion of NEPA and citation to certain of the leading cases under that statute. This material need not be repeated.

The conclusions of law to be drawn regarding the claim against the FHWA follow inevitably from the findings of fact in the present opinion, and do not require elaborate discussion.

Since the January 1977 EIS did not make a true or adequate presentation on the subject of fisheries, the FHWA had the obligation to issue a corrected supplemental EIS, something which it has never done.

Even if one could say that the January 1977 EIS was justified on the basis of the information then existing, nevertheless the LMS fisheries data constituted information of such importance on the subject of environmental impact that the FHWA was under a duty to issue a supplemental EIS.

Such a duty of supplementation is implicit in NEPA. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980). The controlling regulation on the subject, applicable at the time the LMS fisheries report was issued and thereafter, was 40 C.F.R. § 1502.9(c), which was issued by the Council on Environmental Quality and which provides:

"40 CFR § 1502.9 Draft, final, and supplemental statements.

.    .    .    .    .

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

It can hardly be doubted that the LMS fisheries data constituted significant information relevant to environmental concerns and bearing on the impact of the proposed Westway project.

The FHWA, in collaboration with the New York State DOT, acted in willful derogation of the requirements of law in failing to issue a corrective supplemental environmental impact statement. The FHWA fully recognized the serious nature of the environmental impact which had been revealed by the new fisheries data, but refrained from making the required public disclosure.

This is not a situation where the court is substituting its judgment for the reasonable determination of the agency. Nor is it a situation where the difference between the new information and the original EIS is a minor matter of quantification, or where the basics of the subject have been covered and the new information merely displays additional details not affecting the basic presentation.

The issue of impact on fisheries is hardly a peripheral matter. It ranks high in the priority of environmental concerns raised by Westway, and should have been given this priority by the planners of Westway from the very start. The Westway project, as now conceived, depends upon a major landfill in the Hudson River estuary. The production of fish is among the most important of the roles played by such an estuary. Federal law and policy dictate that the utmost care be taken by the responsible agencies before a productive estuary area is replaced by an urban development project. Moreover, the public must be fully and fairly informed of the environmental effects.

Compliance by the FHWA with NEPA was and is a predicate for any lawful action by the FHWA in approving Westway or providing funding for Westway.

Since the FHWA has failed to comply with NEPA, the actions taken by the FHWA in approving the design and location of Westway, and funding for Westway, are null and void as to any further steps to implement Westway, except as specifically authorized by the court. The matter must be remanded to the FHWA for further proceedings in compliance with the law.

■ With regard to the issue of payment for the landfill right-of-way, on which a preliminary injunction was entered on May 14, 1982, plaintiffs are entitled to a final injunction since they have prevailed at trial on their claim against the FHWA. The preliminary injunction will be dissolved and a final injunction will be entered preventing federal reimbursement for the right-of-way acquisition. This will be part of the overall injunction against the FHWA.

An argument has been made that the court should exercise its equitable discretion and exclude the right-of-way payment from the injunctive relief to be granted. The argument is that the State has already condemned the right-of-way and is obligated to the City, and therefore the State should be entitled to reimbursement from the FHWA. The court disagrees. The paramount consideration is that the FHWA and the State have failed to fulfill the conditions of federal law necessary to enable the FHWA to provide, and the State to receive, federal funding. The fact that the State has performed the formalities of condemning City land should not control the situation so as to prevent enforcement of federal law.

So ordered.