SIERRA CLUB, The City Club of New York, Business for Mass Transit, Committee for Better Transit, Inc., NYC Clean Air Campaign, Inc., West 12th Street Block Association, Hudson River Fishermen's Association, Hudson County Citizens for Clean Air, Seymour Durst, Otis Burger, Mary Rowe, and Howard Singer, Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, John Marsh, as Secretary of the Army of the United States, Joseph K. Bratton, as Chief of Engineers, Walter M. Smith, Jr., as New York District Engineer of the United States Army Corps of Engineers, William C. Hennessy, as Commissioner of the New York State Department of Transportation, United States Department of Transportation, Andrew L. Lewis, Jr., as Secretary of Transportation, of the United States, Federal Highway Administration, Raymond A. Barnhart as Administrator of the Federal Highway Administration, The City of New York, Defendants,

and

City of New York,
Defendant-Intervenor.

No. 81 Civ. 3000.

United States District Court,
S.D. New York.

June 27, 1984.

Butzel & Kass by Albert K. Butzel, Mitchell S. Bernard, New York City, for plaintiffs.

Rudolph W. Giuliani, U.S. Atty. by Howard Wilson, Marc H. Rosenbaum, New York City, for Federal defendants.

Kaye, Scholer, Fierman, Hays & Handler by Paul J. Curran, Thomas A. Smart, Kel-

ley J. Newton, New York City, for State defendant-intervenor.

## OPINION

GRIESA, District Judge.

Plaintiffs have applied for an award of attorneys' fees and disbursements.[1] The application is made against all defendants except the defendant-intervenor, City of New York.

Defendants fall into three categories—(1) the United States Army Corps of Engineers and certain officials connected with the Corps; (2) the Federal Highway Administration, the United States Department of Transportation and certain officials connected with those agencies; and (3) William C. Hennessy, who was Commissioner of the New York State Department of Transportation at the relevant times. These groups of defendants will sometimes be referred to as the "Corps defendants," the "FHWA defendants," and the "State defendant."

Plaintiffs assert two grounds for the award they seek.

*First,* plaintiffs seek to recover against all defendants under the common law. In connection with the federal defendants, plaintiffs rely upon a provision of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(b), which in effect waives sovereign immunity as to the United States and its agencies and officials in an application for attorneys' fees and expenses under the common law.

*Second,* they seek to recover against the Corps defendants and the FHWA defendants under another provision of the EAJA, 28 U.S.C. § 2412(d), which allows recovery of attorneys' fees and other expenses by a prevailing party against the United States in a civil action, other than a tort action, unless the court finds that the position of the United States "was substantially justified or that special circumstances make an award unjust."

*Summary of Rulings*

The court concludes that plaintiffs are entitled to recover certain amounts for attorneys' fees and disbursements under the common law. As will be explained, certain issues were tried and appealed regarding which the defendants who were involved had no colorable basis for their positions. Attorneys' fees are awarded in the amount of $261,205 plus disbursements of $29,049, or a total of $290,254. This entire amount is assessed against the State defendants. However, for reasons to be described, the various federal defendants are only liable for part of this sum. The Corps defendants are liable for $155,870 fees and $21,-245 disbursements, or a total of $177,115. The FHWA defendants are liable for $76,-335 fees plus $5,004 disbursements, or a total of $81,339.

Plaintiffs' application under 28 U.S.C. § 2412(d) is denied. Although plaintiffs were prevailing parties on the major issue in the litigation and the court finds that on this issue the positions of the federal defendants were not substantially justified, it appears that plaintiffs include a person whose net worth exceeds $1,000,000. Therefore, recovery under this statutory provision is precluded by 28 U.S.C. § 2412(d)(2)(B).

*The Proceedings*

The relevant proceedings in this litigation are described in the following opinions: *Action for Rational Transit v. West Side Highway Project,* 536 F.Supp. 1225 (S.D.N.Y.1982); *Sierra Club v. United States Army Corps of Engineers,* 541 F.Supp. 1367 (S.D.N.Y.1982); *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011 (2d Cir.1983).

The first of the above captions was handed down on March 31, 1982. This opinion actually dealt with two actions, *Action for Rational Transit v. West Side Highway Project,* and *Sierra Club v. United States Army Corps of Engineers.* Part of the opinion contained rulings dismissing the

---

1. The application is actually made on behalf of four of the twelve plaintiffs. Apparently only these four have made any payments of fees or disbursements to plaintiffs' attorneys.

*Action for Rational Transit* case on motion. The present fee application does not relate to that action or these rulings.

The March 31, 1982 opinion also dealt with the *Sierra Club* action, in which the present fee application is made. That opinion confirmed that a number of the claims made by plaintiffs had been dismissed on motion. However, a trial ("the first trial") had been held on plaintiffs' claim regarding alleged violations of law by the Corps defendants and the State defendant in regard to the impact of Westway on fisheries and the alleged improper grant of a landfill permit by the Corps to the State. In the March 31, 1982 opinion the court nullified the landfill permit subject to further administrative proceedings.

There was a second trial dealing with the fisheries issues as they related to funding approvals granted by FHWA to the State. The June 30, 1982 opinion nullified the basic funding approvals, again subject to further administrative proceedings.

The various parties appealed and cross-appealed. The Corps defendants and the FHWA defendants did not appeal from the basic rulings of the district court on the merits, although they appealed in respect to certain terms of the judgments. The State defendant appealed on the merits. The Court of Appeals affirmed the district court decision in all essential respects as to the merits, although it reversed on certain of the points related to the terms of the judgments.[2]

Plaintiffs' application for attorneys' fees and disbursements was originally made on May 12, 1982. A number of events occurred which caused the decision on the fee motion to be deferred, including the second trial, the appeal, litigation in 1982 and 1983 regarding design and engineering activity during the further administrative proceedings, and unsuccessful efforts to resolve the fee application by settlement.

Moreover, in January of this year the court determined that the various papers submitted on the motion, while extensive,

did not satisfactorily address the issues. Consequently the court requested new briefs.

*Legal Standard Under the Common Law*

■ What is referred to as the normal American Rule is that the prevailing party in a litigation may not recover his attorneys' fees from the loser. Normally each litigant pays his own attorneys' fees. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 245, 247, 257, 95 S.Ct. 1612, 1615, 1616, 1621, 44 L.Ed.2d 141 (1975). However, certain exceptions have been recognized. In *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), the Court held in an admiralty action that the libellant, the prevailing party, was entitled to recover counsel fees. The Court stated that such an award should be considered as part of the damages, since respondents had refused to honor an obligation to libellant which "was plainly owed him." The Court commented that respondents had been callous and recalcitrant in their approach to libellant's claim, had failed to investigate it, and had committed a willful and persistent default. *Id.* at 530–31, 82 S.Ct. at 999. In *F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974), the Court stated:

> We have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, ...

*Vaughan v. Atkinson, supra,* was cited as authority for this proposition. The Supreme Court again discussed the various exceptions to the American Rule in *Alyeska, supra,* citing *Vaughan* and quoting the language from *F.D. Rich* about an award of attorneys' fees being proper where the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." 421 U.S. at 258–59, 95 S.Ct. at 1622.

---

2. An injunction by the district court prohibiting federal reimbursement for acquisition of certain right-of-way was reversed in a separate opinion.

*Sierra Club v. Hennessy,* 695 F.2d 643 (2d Cir. 1982).

■ The "bad faith" exception to the American Rule can apply to either pre-litigation bad faith or to conduct in the course of the litigation. In *Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973), the Court stated:

It is clear, however, that "bad faith" may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.

■ It is obvious that bad faith conduct by a party prior to litigation may be part of a pattern of misconduct which carries forward into the litigation. However, it is the law that a party's bad faith, either prior to or during the litigation, may be the basis for an award of attorneys' fees under the common law rule. In the Second Circuit, *Class v. Norton*, 505 F.2d 123 (2d Cir.1974), and *Stolberg v. Board of Trustees*, 474 F.2d 485 (2d Cir.1973), were cases where the court awarded attorneys' fees to the successful plaintiffs on the ground that willful violations of obvious rights of the plaintiffs had required the bringing of unnecessary lawsuits. *See also Republic of Cape Verde v. A & A Partners*, 89 F.R.D. 14 (S.D.N.Y.1980).

Certain leading Second Circuit decisions illustrate how the bad faith rule is applied to conduct occurring during litigation. In *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078 (2d Cir. 1977), the district court had awarded attorneys' fees to the defendant on the basis that the action was commenced in bad faith and also on the basis that the attorney for some of the plaintiffs had acted in bad faith in taking certain procedural steps during the litigation. The court of appeals reversed the award of fees on the basis of the improper commencement of the action, holding that, under the uncertain state of the law as it existed when the action was instituted, the claim was a colorable one. The court stated (p. 1088):

An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons.

However, the court held that the attorney's procedural bad faith might be the basis for a limited award of attorneys' fees, and remanded the case for specific findings on this issue.

In *Nemeroff v. Abelson*, 620 F.2d 339 (2d Cir.1980), the district court had been presented with a motion by the defendants to assess attorneys' fees against plaintiff and plaintiff's attorneys for bad faith commencement of the action and improper conduct during the litigation. The district court had assessed attorneys' fees on the first ground, but had made no finding regarding the second. The court of appeals reversed the award, holding that the action was commenced in good faith, and remanded the case to the district court for a determination of the propriety of the conduct of plaintiff and his attorneys during the litigation. The decision contains a discussion of the normal American Rule regarding attorneys' fees and the various exceptions, including the bad faith exception. The court stated:

*Browning Debenture Holders', supra,* clarified the requirements for a finding of bad faith in this Circuit. We held that there must be "clear evidence" that the claims are "entirely without color *and* made for reasons of harassment or delay or for other improper purposes." 560 F.2d at 1088 (emphasis added). In the instant case we find it unnecessary to reach the question of the motives of Nemeroff or his counsel, for we hold that the claims were not "entirely without color" at the time the action was commenced.

A claim is colorable, for the purpose of the bad faith exception, when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim. The question is whether a reasonable attorney could have concluded that facts supporting the claim *might be established,* not whether such facts actually *had been established.*

620 F.2d at 348. Upon remand, the district court held that, although the action was commenced in good faith, at a certain point

it became clear that there was no colorable basis for the plaintiff's claims and that thereafter the suit was continued in bad faith. The district court also held that plaintiff's attorneys prosecuted the case in an intentionally dilatory fashion. The court of appeals affirmed the attorneys' fee award on the first ground and did not reach the second ground. *Nemeroff v. Abelson*, 704 F.2d 652 (2d Cir.1983).

It should be noted that the discussions by the Second Circuit regarding bad faith claims asserted by a plaintiff have been applied to bad faith defenses asserted by a defendant. *Republic of Cape Verde v. A & A Partners*, 89 F.R.D. 14 (S.D.N.Y.1980).

In the present case, plaintiffs contend that they are entitled to an award of attorneys' fees against all defendants under the above authorities. They do not contend that the Corps defendants were guilty of pre-litigation bad faith, but they do make such a contention against the FHWA defendants and the State defendant. Plaintiffs claim that all defendants acted in bad faith in the litigation.

Although the ensuing discussion will cover events both before and during the litigation, it is necessary to start with a description of the issues raised by the parties in the litigation.

*Factual Findings on Common Law Claim*

The present suit was commenced in March 1981. It was originally brought against the Corps defendants and the State defendant. Plaintiffs claimed that the Corps had failed to issue a proper environmental impact statement ("EIS") in connection with the State's landfill application for Westway, that the Corps had failed to give due consideration to environmental factors, and that the issuance of the landfill permit was not in compliance with the law. Plaintiffs raised the fisheries issue as well as a number of other issues. All the non-fisheries claims were dismissed on motion in November 1981. However, it was determined that a trial would be necessary on the fisheries issue.

On the latter issue, plaintiffs' case rested largely upon the alleged inadequacy of an EIS which had been issued by FHWA and the New York State Department of Transportation ("NYSDOT") in January 1977. This EIS had been relied upon by the Corps to fulfill its responsibility under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* The January 1977 EIS and an accompanying water quality report had described the proposed landfill area, known as the interpier area, as "biologically impoverished" and as a "biological wasteland." These documents indicated that there was no fish life of any significance in the interpier area. Plaintiffs claimed that these descriptions were incorrect and that indeed, prior to issuing the landfill permit, the Corps had obtained the results of a fish study, conducted by Lawlor Matusky & Skelly at the behest of the State in 1979–80 ("LMS study"), which showed that the interpier area was a habitat for a variety of fish, particularly young striped bass. Plaintiffs claimed that the Corps violated NEPA in failing to issue a Supplemental Environmental Impact Statement ("SEIS"). Plaintiffs further claimed that, in considering the landfill permit application, the Corps gave no proper consideration to the fisheries information.

For purposes of analysis, it must be borne in mind that, in connection with the landfill permit application, the Corp's responsibilities included compliance with two statutes—*i.e.*, NEPA and section 404 of the Clean Water Act, 33 U.S.C. § 1344. As stated, the EIS obligation arose under NEPA. The Clean Water Act required the Corps to give notice of the landfill permit application, hold hearings, make its assessment of the impacts of the project in relation to the public interest, and create a reasoned administrative record for its decision. *See* 701 F.2d at 1031–33.

At the trial, the Corps conceded that the LMS study had produced different information from what was contained in the January 1977 EIS. However, the Corps defendants took the position that the LMS study had not altered the *conclusion* of the January 1977 EIS—*i.e.*, that the landfill would not have a significant impact on the *overall* striped bass resources of the Hudson Riv-

er. On this basis, according to the Corps defendants, the Corps made a valid exercise of discretion in deciding not to issue an SEIS. Also, the Corps defendants took the position at trial that the Corps had properly considered the fisheries issue, including the LMS data, in connection with its public interest review under the Clean Water Act. The Corps defendants' Trial Memorandum of January 15, 1982 summarized their argument (p. 2):

> The Army Corps expressly and carefully addressed the very issue now relied upon by the plaintiffs as their last remaining challenge to the Westway project [the fisheries issue]. The Corps, after considering the LMS study, which specifically addresses the issue of striped bass overwintering,* as well as the comments of NMFS, FWS and EPA and members of the public ... concluded that there would not be a significant impact on the overall striped bass resources of the Hudson River.

The asterisk in the above quotation referred to the following footnote:

> Volume I of the LMS study, at page 4.0–17, concludes that:
>
> For the striped bass population, the project area appears to represent one of many available habitats that various portions of the population occupy during the winter months in years when temperatures are mild and conditions are favorable.

At a later point the Trial Memorandum stated (p. 9):

> In this case it is beyond question that the Army Corps squarely considered the factors relevant to its decision on whether to supplement. Those factors included the intensity of striped bass overwintering in the winter of 1979–80, and the availability of other habitats. Moreover, the Corps submits that it was fully correct in its conclusions regarding the availability of other habitat, and most certainly did not make the "clear error of judgment" which alone could justify this Court in concluding that the Corps was arbitrary or capricious.

The State defendant made basically the same defense—*i.e.*, that the LMS data did not alter the conclusion reached in the EIS about the effect of the landfill on overall Hudson River productivity. Pretrial Memorandum pp. 10–11. The State defendant also relied heavily on the conclusion of the LMS report that the interpier area is one of "many available habitats" for the overwintering of striped bass. Pretrial Memorandum p. 6.

The first trial took place January 19 to February 1, 1982. Before discussing the evidence at that trial, the events leading to the second trial will be summarized.

The March 31, 1982 opinion contained extensive findings to the effect that the data developed in the LMS study of 1979–80 so seriously undercut what had been stated in the January 1977 EIS about the absence of fish life in the interpier area that it was improper for the Corps not to issue an SEIS. The court further found that the Corps failed to give due consideration to the fisheries data in connection with its public interest review. Since the FHWA defendants had not yet been brought into the action, there were no findings of violation of law as to those defendants. However, the March 31, 1982 opinion had obvious implications as to FHWA, which had signed the January 1977 EIS. The court noted in the opinion that there would need to be consideration as to whether the injunction to be entered should cover FHWA. 536 F.Supp. at 1229.

Subsequently, the complaint was amended to include the FHWA defendants. Plaintiffs announced that they would rest on the existing record in connection with their claims against FHWA. However, the FHWA defendants asserted that there were new issues requiring trial, and the State defendant agreed.

The FHWA defendants set forth their defenses in an Offer of Proof dated May 11, 1982. They asserted basically the same defense which had been posed by the Corps defendants in the first trial—*i.e.*, that the LMS data did not change the conclusion in the January 1977 EIS that the landfill

would not significantly damage Hudson River fisheries. The State defendant took the same position. It may well seem puzzling that these defendants pressed the very contention which had been rejected by the court following the first trial. However, the FHWA defendants and the State defendant urged that arguments about the conduct of FHWA and its funding approvals were not precluded by the findings as to the Corps.

Following the second trial, the court issued its June 30, 1982 opinion, which found that FHWA had violated NEPA in respect to the fisheries issue, and that misconduct on the part of the State had contributed to this violation.

We now come to the specific question presented by plaintiffs' application for attorneys' fees. This question is not whether defendants were wrong on the merits, but whether their defenses were asserted in bad faith within the meaning of the authorities cited above. Were these defenses "entirely without color and made for reasons of harassment or delay or for other improper purposes"? Or did the defenses have "some legal and factual support, considered in light of the reasonable beliefs" of the parties posing them?

A circumstance should be noted here, which is obvious but nevertheless important to bear in mind. By the time the defense positions were laid out, the various defendants were in full command of the relevant facts. The Corps defendants and their counsel knew exactly what they had done and had not done in connection with the Westway matter. The same is true for the FHWA defendants and the State defendant. Each group of defendants was in a position, prior to the commencement of the trial involving the particular defendants, to know positively whether the defenses asserted had a reasonable degree of merit or not.

*The First Trial*

As described earlier, the first trial involved the issue under NEPA as to whether the Corps had made a valid exercise of discretion in not issuing an SEIS, particularly in view of the LMS data. There was

also the issue under the Clean Water Act as to whether the Corps adequately considered the fisheries issue in its public interest review. Although the trial focused to a large extent upon the processes of the Corps, the State defendant was intimately involved with the issues and was, of course, critically interested in the outcome, since plaintiffs were seeking to void the landfill permit granted by the Corps to the State.

In considering the materials set forth below it is well to keep in mind the position of the Corps that it "expressly and carefully addressed" the fisheries issues, and that it "squarely considered" the relevant fisheries factors in "its decision on whether to supplement." Another argument central to the position of all defendants throughout both trials was that despite the new *information* presented by the LMS report, which contradicted the factual description in the January 1977 EIS, nevertheless the LMS data did not change the *conclusion* of the January 1977 EIS that the landfill would have little impact on the overall productivity of the Hudson River.

The following is a summary of the pertinent evidence at the first trial, and the findings of the district court and the court of appeals.

The landfill application was before the district engineer (the first of the three tiers of review in the Corps) for 2½ years—from April 1977 until September 1979. The Corps announced in April 1977 that the January 1977 EIS, which had been issued by FHWA and NYSDOT, would be regarded as adequate for the purposes of the Corps. 701 F.2d at 1021. Soon after this, the district engineer commenced receiving objections to the granting of the landfill permit from the National Marine Fisheries Service ("NMFS") and the Fish and Wildlife Service ("FWS"), and received a request from the Environmental Protection Agency ("EPA") to conduct a more thorough study regarding fisheries. The district engineer passed these comments on to NYSDOT. However, the district engineer

took no action to make any study of fish life in the interpier area.

EPA prevailed upon NYSDOT to have such a study performed, and the result was the LMS study. The work by LMS was carried out from April 1979 to April 1980. In September 1979, without waiting for the LMS study to be completed, the district engineer recommended that the landfill permit be issued. In connection with the fisheries question, the district engineer's report merely reiterated the material contained in the January 1977 EIS. The report noted the ongoing study being made by LMS, but concluded that the information from this study would not be necessary for decision on the Westway landfill matter. The district engineer made the specific finding that no SEIS was required.

The evidence at the first trial was "a virtual blank" as to what the district engineer and his staff did by way of consideration of the critical issues. 536 F.Supp. at 1241. The district engineer did not testify.

There was no colorable basis for any claim that the district engineer "expressly and carefully addressed" the fisheries issues, or that he in any way fulfilled the obligations imposed by NEPA and the Clean Water Act.

From September 1979 until January 1981 the Westway landfill application was before the division engineer. This was an important phase of the proceedings, since the LMS report was received by the Corps in September 1980. The net result of the various events which occurred during this period of time was that the division engineer declined to issue an SEIS (although requested to do so by EPA and also by the Sierra Club) and recommended issuance of the landfill permit.

The court of appeals quoted with approval from the March 31, 1982 district court opinion:

The most significant environmental impact requiring consideration by the Corps of Engineers was the impact of the proposed landfill on fishery resources.

.　　.　　.　　.　　.

After the [Lawler] report was obtained, at the instance of the other agencies, the invalidity of the conclusions in the January 1977 EIS regarding aquatic impact was proved. The interpier area was shown to be a highly significant and productive habitat for fish, including striped bass.

701 F.2d at 1024–25. The court of appeals added its own finding, in comparing the decision of the division engineer with that of the district engineer:

The division engineer's decision was at least equally flawed. By the time that decision was rendered, the Lawler report had been received, and it confirmed the criticisms of the objecting federal agencies and revealed the inaccuracy of the FEIS's conclusion that the interpier area was a biological-wasteland. Nonetheless, the division engineer, like the district engineer, merely forwarded all federal agency criticisms of the FEIS to NYSDOT and FHWA, and had no independent Corps study made of the questions raised.[3]

701 F.2d at 1032.

Again, the question is not whether the Corps won the case on the merits (which it obviously did not), but whether the position of the Corps was so wholly lacking in merit that it could not be asserted in good faith. This brings us back to the contention of the Corps that it expressly, carefully and squarely reviewed the fisheries issues, and that such review was the basis of its decision, or exercise of discretion, in not issuing an SEIS, and also the basis of the decision to grant the landfill permit.

As far as the administrative record is concerned, there is an absolute void as to any indication that the division engineer made this kind of reasoned consideration or decision or exercise of discretion. The rec-

---

**3.** The court of appeals referred to the January 1977 EIS as the "FEIS"—Final Environmental Impact Statement.

ommendation of the division engineer was contained in a report dated January 16, 1981. This report avoided any discussion of the LMS striped bass data and the magnitude of the findings of striped bass in the interpier area. This recommendation was preceded by a staff report prepared in the division office in November 1980. The staff report was similarly blank on the subject of the striped bass and the issues raised by the LMS report. 536 F.Supp. at 1250–51.

As to testimony, there was none from the division engineer, nor was there any testimony by any member of his "Westway Committee." Instead, the Corps called two biologists who had participated in the Westway matter at the division level—Linda Monte and Robert Pierce. Monte was the junior of the two. She had been employed by the district engineer while the Westway application was in the district office, and was assigned to the division in November 1979. She worked on the Westway matter until she took maternity leave in November 1980. She drafted the material regarding aquatic impacts in the November 1980 staff report and in the January 16, 1981 division engineer's report.

Monte's testimony is remarkably lacking in content. She met at times with General Lewis, the division engineer, and at times there were meetings involving Lewis, Pierce and Monte. No notes or records were kept of those meetings. Monte testified that Lewis was "very thorough … very interested" in the Westway project, and that he received briefings on the fisheries issue (Tr. 1133–34). After the LMS report arrived, Lewis, Pierce and Monte "discussed all of the fish that were using that area, and that included the striped bass" (Tr. 1138). They discussed "all of the parameters in the LMS Report" (Tr. 1146). On cross-examination Monte was asked what was said in these discussions of "all the fish" and "all of the parameters." Her answers did not show any discussions of substance on the critical issues. For instance, she did not recall any detailed discussion of the problems of overwintering striped bass (Tr. 1220–22).

Monte could not recall whether she did or did not make a recommendation on the question of whether to issue an SEIS (Tr. 1186).

It is true that Monte testified that she made an "impact analysis," and did not find that, based on the information received, the elimination of the interpier area would affect the Hudson River fisheries in an "unacceptable manner." She believed that the impact of the project would be "minor" (Tr. 1186). She further testified that "we" (meaning herself, Pierce and Lewis) "concluded that it wouldn't have an unacceptable impact on the fisheries of the Hudson River" (Tr. 1146). *See also* Tr. 1231–32. The trouble is that there is no evidence whatever that these conclusions were based on anything like a detailed and systematic analysis. There is no evidence that Monte was even assigned to make such an analysis. For instance, Monte testified that she believed that there were adequate areas in the Hudson River, apart from the interpier area, where the young striped bass could overwinter (Tr. 1150, 1201–2, 1214). This belief was the foundation for her conclusion that the landfill would cause only a minor impact. However, Monte did not do any statistical analysis to arrive at her belief. She did not even take the LMS data and try to compare the contribution of the interpier area as a habitat with the rest of the estuary (Tr. 1222–23).

Monte testified that, in addition to the LMS data, the Corps had certain other information about striped bass habitats in the Hudson River. However, the figures in these other sources of information could not be compared directly with the LMS data, and this other material merely gave an "overall impression" (Tr. 1202). Moreover, even in connection with this overall impression, Monte did not actually look at the sources (Tr. 1229).

Pierce's testimony was even less supportive of the position of the division engineer. He was a biologist in the division office, and was a consultant to the Westway Committee and to Lewis. He came to the con-

clusion that the techniques used in arriving at the presentation in the January 1977 EIS were faulty (Tr. 1240). At some point, (presumably as a result of the LMS data) Pierce concluded that the interpier area played a normal role as part of the Hudson River estuary in the production of fish, and he so advised Lewis (Tr. 1246). Pierce expressed to Lewis a concern as to what the loss of the interpier area would do to the "carrying capacity" of the Hudson River in regard to fish production, and recommended to Lewis that the Westway landfill permit be denied (Tr. 1247–48).

However, Pierce was not assigned to make any detailed analysis of the LMS findings. He was not asked to undertake any professional assignment with regard to the striped bass. It was Monte, and not Pierce, who drafted the sections of the staff report and the division engineer's recommendation regarding fisheries.

Pierce testified as to no discussions or considerations on the question of whether to issue an SEIS.

After the division engineer had made his recommendation, the Westway matter went to the chief of engineers. Neither the chief, nor the assistant who worked with him on the matter, testified at the trial. A biologist in the chief's office, Dr. Hall, testified that he had reviewed the matter and had written a memorandum commenting on the "significance of the [interpier] area as habitat" for striped bass. There is no evidence that the chief of engineers consulted with Hall or did anything other than rely upon the recommendation of the division engineer.

The court of appeals quoted with approval the finding of the district court that, "The total failure of the Corps to comply with [its] obligations has been demonstrated beyond any question." 701 F.2d at 1011. The court of appeals also noted the "surprising dearth of evidence as to the nature and substance of the Corps's investigations and deliberations." *Id.* The court specifically commented on the failure of any of the responsible Corps officials to testify. *Id.*

Under all of the circumstances, it must be concluded that there was no basis for saying that the Corps "expressly and carefully addressed" the fisheries issue vis a vis its statutory obligations. There was no testimony whatever in the first trial as to any deliberation or any exercise of discretion or the making of any decision on the question of whether to issue an SEIS to correct the misinformation contained in the January 1977 EIS.

Both the Corps defendants and the State defendant argued at the trial that the Corps was entitled to rest on the January 1977 EIS and not issue an SEIS, because the LMS data did not change the *conclusion* that overall Hudson River fish productivity would not be harmed. However, no witness from the Corps ever testified as to this line of reasoning. One can well understand why.

■ In the first place, the argument is based on a fallacious legal premise. We are not talking about an uncertain area of the law or a novel legal proposition. We are dealing with a clear and well-settled requirement under NEPA. If a proposed project will result in the destruction of a significant amount of forest or park land or wetlands or fisheries habitat, then that *information* must be stated in the EIS; it is not sufficient to merely state someone's *conclusion* that the overall forestry or park or wetlands or fishery environment in some broad area will not be unduly affected. A reading of the court of appeals opinion in the present case is sufficient to show that the requirement of NEPA is for the disclosure of relevant *information.* 701 F.2d at 1029–30. Of course, the January 1977 EIS provided what was represented to be correct information as a back-up to its conclusion regarding aquatic impact. When that information was proven to be wrong (not in some small detail but grossly wrong), the law required the Corps to supplement and correct the misinformation. The applicable regulation governing supplementation provides that an SEIS should be prepared where there are "significant new circumstances or information relevant to

environmental concerns ...." 40 C.F.R. § 1502.9(c)(1)(ii).

Thus there was no basis whatever for the argument that the Corps's NEPA obligation related solely to some alleged conclusion regarding overall Hudson River productivity.

Even from a factual standpoint, the purported conclusion had some serious problems. Its basis was said to be the language in the LMS report, quoted in the Corps defendants' Trial Memorandum as described above, that the interpier area "represents one of many available habitats" for striped bass. LMS Report p. 4.0–17.

In the March 31, 1982 opinion, the court found that the LMS report had two aspects. *First,* the report was sufficient to apprise the Corps of the significance of the interpier area as a striped bass habitat, as demonstrated by, among other things, the memorandum of Corps biologist Hall specifically referring to "the significance of the area as habitat." 536 F.Supp. at 1247. *Second,* some phases of the LMS study were misleading and attempted to avoid the full impact of the facts revealed in the study. Specifically, the conclusion about "one of many available habitats" was misleading because it attempted to give the impression that the interpier area was one of many habitats more-or-less equal in importance and productivity, whereas the data gathered by LMS showed that, except for a New Jersey site across the river, the abundance of striped bass found in the interpier area was enormously greater than that found in any other location sampled. 536 F.Supp. at 1247–48. The court of appeals found that the LMS data were not fully disclosed in the LMS *report,* and that the Westway Project[4] officials knew this, although the Corps may *not* have known of this at the time. 701 F.2d at 1023 n. 12 and 1046–47.

In this connection the court of appeals was dealing with the issue of whether the parties were in bad faith at the time of the events in question.[5] However, by the time of the first trial all the parties and their attorneys had been able to analyze the LMS report and its conclusions fully. There is little excuse for defendants putting forth the conclusion about striped bass in the LMS report as representing a scientific judgment upon which they were entitled to rest their position. Moreover, as the court of appeals specifically found, the State's representatives had known of the misleading nature of the LMS report from the start.

In any event, despite differences in the degrees of knowledge of the Corps and the State at the time of the events, the Corps possessed a sufficient body of information from the LMS study so that it knew or, with the slightest bona fide consideration, should have known that there was "significant ... information" within the meaning of the applicable regulation, which required the issuance of an SEIS. No one from the Corps came to the witness stand and testified, "I considered the LMS report and decided that it was not significant information." Such testimony would have been outlandish. Indeed, the only way defendants were able to give the appearance of having a valid defense was to phrase the issue in a way that veered off from the law and to make use of a spurious "conclusion" in the LMS report.

■ The court concludes that the defenses asserted by the Corps defendants and the State defendant at the first trial were entirely without color. The positions asserted by defendants were ones which they totally failed to support in law and in fact. As to the motives of defendants (*see Nemeroff v. Abelson,* 620 F.2d at 348), it must be concluded that the defenses were asserted for an improper purpose. To occupy one's opponents and the court in meritless

4. There was an administrative entity called the "Westside Highway Project" (referred to in the various opinions as "the Westway Project" or "the Project") under the jurisdiction of NYS-DOT.

5. This issue arose in the court of appeals' review of the district court's appointment of a special master. The appointment was reversed.

and fruitless litigation is an illegitimate endeavor for which there is no proper purpose.[6]

### The Second Trial

As described earlier, the second trial resulted from the fact that, following the March 31, 1982 opinion, the complaint was amended to bring in the FHWA defendants. Plaintiffs claimed that the January 1977 EIS, signed by NYSDOT and FHWA, was inadequate, in regard to fisheries, when issued, and that in any event the LMS data made it necessary for FHWA to issue an SEIS.

In connection with the present fee application, the FHWA defendants and the State defendant assert that no second trial would have been necessary if plaintiffs had included the FHWA defendants in their original complaint, and that they should have done so.

The court has voiced some criticism of plaintiffs for not including the FHWA defendants in the case from the outset. However, upon an analysis of the record, the court concludes that the total amount of trial time was not appreciably increased because there were two trials instead of one. Each trial involved different witnesses who testified about different phases of the activities of the federal agencies and the State.

At the second trial plaintiffs rested on the record of the first trial. However, both the FHWA defendants and the State defendant presented an extensive case. In connection with the State's witnesses, it is necessary to note that the State had acted in Westway matters through NYSDOT, which had in turn acted largely through an administrative entity known as the "West-way Project" (see footnote 4). The Westway Project employed various consulting firms, the principal one of which was Systems Design Concept, Inc. ("Sydec"). The State called witnesses from NYSDOT itself and also from the Project and Sydec.

As to the question of the adequacy of the January 1977 EIS when issued, the district court found in its June 30, 1982 opinion that there was no basis for the conclusion put forth in the EIS and the accompanying water quality report that the interpier area was a "biological wasteland" and was "biologically impoverished," and found that the authors knew or should have known of the lack of factual basis. 541 F.Supp. at 1371–72. In affirming, the court of appeals referred to the "baseless and erroneous factual conclusion" of the January 1977 EIS, 701 F.2d at 1034, the "cavalier manner in which the Project had reached its conclusion" and the fact that there was "no evidence that FHWA made any independent evaluation whatever of the fisheries issues" in connection with the January 1977 EIS. Id. at 1031. See also id. at 1046.

However, the question of the effect of the later LMS data and whether this data required an SEIS was the subject of the bulk of the testimony offered by defendants at the second trial. Witnesses from FHWA and the State admitted that at least by the time of the receipt of the LMS data they knew that the conclusions presented in the January 1977 EIS were based on faulty investigative techniques. 541 F.Supp. at 1371–72. The LMS data showed a wholly different set of facts from what was set forth in the flawed 1977 EIS. It is difficult to understand how there was even an arguable justification for FHWA and

---

**6.** At the end of the first trial I remarked that I thought that there was "an honest conflict" and that the witnesses had been "remarkably candid" (Tr. 1496). I have no reason to depart from my statement about the impression the witnesses made. However, the conclusions to be drawn from an analysis of their testimony are something else again. As to my statement about there being an "honest conflict," that impression was not, of course, a finding of fact, and it has obviously been superseded by the findings I have made upon an analysis of the evidence and the law. This process illustrates the fact that there may be cases in which, because of the subject matter or for other reasons, a party to a litigation can appear to create difficult issues, which require a considerable effort on the part of the court to deal with. However, there are times when, after all the arguments and the evidence are sorted out, it becomes apparent that there was no legitimate basis for certain claims or defenses and no bona fide reason for occupying the court with the matter. Such is the case here.

the State not issuing a corrective SEIS. However, the FHWA and State defendants put on a lengthy case at the second trial on this issue.

The character of the defense evidence on this subject is described in the June 30, 1982 opinion. The three principal defense witnesses were Graham Bailey, Area Engineer for FHWA; Lowell K. Bridwell, Executive Director of the Westway Project from 1972 to 1981; and Joan Walter, an employee of Sydec. The court described their testimony as follows:

> In connection with the three principal defense witnesses—Bailey, Bridwell and Walter—it is apparent that they have not disclosed the facts in a full and candid fashion. The testimony of these witnesses was characterized not only by a striking lack of plausibility on critical points, but also by a remarkable amount of inconsistency, evasion, and asserted loss of memory on matters where memory would be expected.

541 F.Supp. at 1372. The court of appeals had this description of the testimony of the FHWA witnesses:

> ... faulty memories (perhaps conveniently blank, *see* 541 F.Supp. at 1372) ...

701 F.2d at 1040–41.

The district court found that the LMS data, as gradually obtained by the Project and FHWA prior to the issuance of a report by LMS, was a matter of "acute concern," and that the Project and FHWA responded with a "plan to delay the issuance of the report by LMS, and to manipulate the presentation of this data in order to mask its full import." 541 F.Supp. at 1373. The court of appeals found that it was not so clear that FHWA joined in the scheme to delay, and that the attribution of "full knowledge and scheming in the early

summer of 1980" to FHWA was contraindicated by other evidence. 701 F.2d at 1046. However, the court of appeals stated that "the record amply supports the district court's findings of bad faith on the part of the Project and its officials," and that FHWA proceeded in bad faith after a meeting of August 20, 1980, at which time FHWA received the "complete picture" about the significance of the interpier area as a fish habitat from the Project and joined ranks with the Project in preventing disclosure. *Id.* at 1046–47.[7] The court of appeals stated:

> We also concur in the district court's inference that the Project's machinations to avoid disclosure of the Lawler data suggested that in the Project's view the data were highly significant rather than insignificant, and we agree that the same inference is permissible as to FHWA's assessment of the data in light of its joining ranks with the Project in preventing disclosure.

*Id.* at 1047.

The June 30, 1982 district court opinion contained a further discussion, in addition to what had been described in the March 31, 1982 opinion, regarding the misleading nature of the LMS report. For the sake of the present motion the following finding is significant:

> At the very least, the method of presentation in that report created a facade which could be used officially by the Project, the FHWA and the Corps of Engineers to justify their various actions which are now in question. Moreover, the spurious conclusions in the LMS report about striped bass have been referred to over and over again by defend-

---

**7.** The State defendant, in its papers on the present motion, attached a copy of certain materials relating to an investigation in the State of Maryland as to the conduct of Bridwell in the Westway matter. Bridwell is now Secretary of Transportation of Maryland. Among other things, the State defendant argues that a panel report and the Governor's report take a somewhat different view of the events at the August 20, 1980 meeting from what the district court found in the June 30, 1982 opinion. The Mary-

land materials are not a part of the record in the present case. If administrative investigation reports were to be considered, then it would be appropriate to include the June 1984 report of the State of New York Commission of Investigation entitled *The Westway Environmental Approval Process: The Dilution of State Authority*. However, it is the view of the court that the present motion must be decided solely on the basis of the court record.

ants and their witnesses in this litigation to support positions taken by them. 541 F.Supp. at 1378. The court of appeals agreed that the Project knew that the LMS data "were not fully disclosed in the Lawler report." 701 F.2d at 1023 n. 12 and 1047.

Another pivotal event focused on at the second trial was the October 9, 1980 letter from FHWA to the Corps. Previously the Corps had received certain comments from EPA and the Sierra Club to the effect that the January 1977 EIS was inadequate and that an SEIS should be issued. The Corps passed these on to FHWA for its views, which replied in the letter of October 9, 1980. This letter took the position that an SEIS was not necessary, that the LMS data did not lead to any different conclusion from what was in the 1977 EIS, and that the LMS data meant nothing more than— "fish use the area." The district court found that this statement, and the entire description relating to fisheries in the October 9, 1980 letter, were "simply fraudulent." 541 F.Supp. at 1379. The court of appeals referred to the letter as a "fraudulent characterization" and a "blatant misrepresentation." 701 F.2d at 1047.

There was evidence about the authorship of the October 9, 1980 letter, which the district court called "nothing short of bizarre." 541 F.Supp. at 1379–81. *See also* 701 F.2d at 1041. As a result of a surprisingly difficult inquiry, it was finally established that the relevant language in the letter was given by the Project to FHWA. 701 F.2d at 1047.

Of course, aside from advising the Corps about whether the Corps needed to issue an SEIS, FHWA needed to make a decision on this subject in order to meet its own statutory responsibility. Since FHWA had signed the January 1977 EIS jointly with NYSDOT, presumably there would be some coordination with the State on this subject. No authoritative person from either FHWA

or the State testified that he either made the decision not to issue an SEIS or recommended such a decision. The district court concluded that the decision was made in a manner none of the witnesses was willing to admit. 541 F.Supp. at 1379.

It is necessary now to determine what conclusions are to be drawn from the facts developed at the second trial. There is simply no escape from the conclusion that the authorized representatives of the State and FHWA engaged in bad faith conduct prior to the litigation. Moreover, it is the kind of conduct which is most germane to an application for attorneys' fees. Part of the activities of the State and FHWA consisted of an attempt to create a record of purported scientific judgment (*e.g.,* the misleading conclusion in the LMS report) and purported agency discretion (*e.g.,* the October 9, 1980 letter from FHWA to the Corps.[8]). It is perfectly obvious that the intention was to have this "record" available to forestall or rebut a challenge to the agency action. This is exactly the use that has been made of these materials. Defendants have relied heavily on them for their defense in this litigation.

To be perfectly clear on the question of pre-litigation bad faith, it should be repeated that both the district court and the court of appeals found bad faith on the part of the State during the entire time beginning with the receipt of the LMS data. The district court found bad faith on the part of FHWA beginning with the receipt of the LMS data. The court of appeals felt that the bad faith of FHWA started with a precise event—the August 20, 1980 meeting. This was, of course, prior to FHWA's October 9, 1980 letter.

As to the conduct of the FHWA defendants and the State defendant in the second trial, the court finds that the defenses they presented were entirely without color. By the time of this trial defendants knew that the fisheries material in the January 1977

---

**8.** In addition, FHWA and NYSDOT issued a document entitled "Reevaluation" in 1981 purporting to review the question of whether to supplement the January 1977 EIS. Of course, the decision not to supplement was made in the

summer and fall of 1980. The discussion in the Reevaluation followed the pattern of the earlier documents in presenting a wholly misleading discussion of the fisheries issue. 541 F.Supp. at 1382.

EIS was not only false but had been based on a wholly inadequate investigation of the facts.

Of course, the main claim made by plaintiffs at the second trial was that, following the receipt of the LMS data, FHWA had a duty to issue an SEIS. Most of the evidence related to this issue. The attempt of both the FHWA defendants and the State defendant to present defenses on this issue was lacking in any colorable basis. Although defendants purported to come forward with authoritative witnesses, in contrast to the first trial, the results can only be described as disastrous.

■ We recognize that one of the main duties of a trier of the fact in a lawsuit is to assess the credibility of witnesses. Surely it would not be said that a claim or defense is entirely without color every time some testimony is found to be untrue.

But the credibility problems at the second trial went far beyond the usual or normal. They were extraordinary. At the beginning of the third day of the second trial, the court commented on the fact that the witnesses were not telling the facts, but were merely stating positions; that witnesses were skipping over large blocks of time and over important events. The court commented on a witness who was quite obviously following a "script" which he forgot, causing some difficulty in his further testimony. The court urged that the defense attorneys make every effort to see that witnesses obeyed the oath (Tr. 262–65). Unfortunately, the serious credibility problems continued, as the record amply demonstrates.

This abnormal and extraordinary situation regarding the lack of credibility of the defense witnesses reinforces the conclusion that, at the second trial, defendants asserted positions which lacked any reasonable basis.

### The Appeal

The federal defendants did not appeal from the district court findings described above. However, the State defendant did appeal these findings. Plaintiffs claim that the State's appeal was without colorable basis.

The State defendant asserts that the district court cannot properly determine whether attorneys' fees should be awarded for the appeal, and that this question should be addressed to the court of appeals. However, *Perkins v. Standard Oil of California*, 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1970), is to the contrary.

■ In the present case, the State defendant's appeal from the district court findings on the fisheries issue was merely a further assertion of the baseless positions taken in the district court. It is appropriate to include an award for the appeal in the amount assessed against the State defendant.

### Conclusions on Bad Faith Claim

■ For the foregoing reasons, the court concludes that plaintiffs are entitled to an award of attorneys' fees and disbursements against the Corps defendants and the State defendant for the assertion of bad faith defenses in the first trial. In connection with the second trial, the court concludes that plaintiffs are entitled to an award of attorneys' fees against the FHWA defendants and the State defendant because of their bad faith conduct both prior to and during the second trial. Plaintiffs are entitled to an award against the State defendant in connection with the appeal. These awards are limited to the fisheries issue.

### Common Benefit Theory

■ Plaintiffs assert another ground under the common law. They contend that this case falls within the common benefit exception to the American Rule. Under this exception, a party is entitled to recover attorneys' fees where a suit confers a substantial benefit to members of an ascertainable class. Plaintiffs urge that the results of this litigation have benefited both the taxpayers of the State of New York and of the United States as a whole, and that an award of fees against the State and against the United States will operate to spread the cost of the litigation among all of these benefited persons. The com-

mon benefit rule does not apply to this case. The class must be finite and identifiable, and the rule does not apply to situations where a plaintiff's action has simply vindicated a general social grievance. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478–79, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980); *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 267, 95 S.Ct. 1612, 1626, 44 L.Ed.2d 141 (1975).

### Alternate EAJA Claim

■ Aside from the claims under the common law, plaintiffs seek attorneys' fees against the federal defendants under a provision of the EAJA which allows recovery of fees and other expenses to a prevailing party against the United States in a civil action, other than a tort action, unless the court finds that the position of the United States "was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d). This provision was repealed effective October 1, 1984, but applies to any action commenced before the date of repeal.

The term "party" in this provision is defined to mean, among other things, an individual whose net worth did not exceed $1,000,000 at the time the civil action was filed. 28 U.S.C. § 2412(d)(2)(B).

The court finds that all of the conditions for an award under this provision are met, except that one of plaintiffs, Seymour Durst, has a net worth exceeding $1,000,-000. Plaintiffs argue that Durst is not one of the plaintiffs making this application for fees. Only four of the twelve plaintiffs are making the application. *See* footnote 1. Also, it is asserted that there is an agreement with Durst not to bill him for any fee and disbursements.

However, Durst is a plaintiff. It would appear to be reasonable to consider plaintiffs together for the sake of applying this section of the statute. Since one of plaintiffs has a net worth over $1,000,000, recovery is precluded under 28 U.S.C. § 2412(d).

### Eleventh Amendment Defense

■ The Eleventh Amendment to the United States Constitution provides that the judicial power of the United States does not extend to any suit in law or equity against a state by citizens of another state. It has consistently been assumed that the sovereign immunity of a state also applies to bar a suit against a state by citizens of the same state. *Great Northern Life Insurance Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

However, it has been held that this doctrine does not bar a suit in a federal court against a state official, acting in his official capacity, where the suit is for injunctive relief. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Also, if injunctive relief is granted against the state official and if there is ancillary monetary effect against the state treasury, the Eleventh Amendment will not act as a bar. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The Second Circuit has construed the latter doctrine to permit recovery of attorneys' fees when the award is incident to a judgment granting prospective injunctive relief. *See Gagne v. Maher,* 594 F.2d 336 (2d Cir. 1979), *aff'd,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980).

■ The soundness of this rule is illustrated by the present case. Although the suit was brought to attack the Corps of Engineers' decision to grant the landfill permit, and later the FHWA's decision regarding funding, the State of New York had a crucial interest in the suit because it was the beneficiary of the federal decisions. It was appropriate, and undoubtedly necessary, for plaintiffs to join as a defendant the responsible State official, the Commissioner of Transportation. The State, through the Commissioner, took a most active role in the litigation in defending the landfill permit and the funding. There was never any question about the jurisdiction of the court over the Commissioner and the right of the Commissioner to participate in the case. However, the Commissioner was bound to observe the rules and standards of conduct applicable in a federal court. It

necessarily follows that the Commissioner should be subject to sanctions, including the assessment of attorneys' fees and disbursements, for failure to observe these rules and standards.

### The Punitive Damage Argument

■ The State defendant argues that recovery of attorneys' fees on the basis of a finding of bad faith is barred because such an award would in effect amount to a judgment for punitive damages.

*City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), held that punitive damages may not be awarded against a municipality in an action under 42 U.S.C. § 1983. The court recognized that municipal immunity from punitive damages was a broadly applied doctrine. In the present case, the State defendant argues that this rule prevents him from being subject to an award of attorneys' fees.

The dispositive point is that a judgment for attorneys' fees based on bad faith is not the same as the imposition of punitive damages in a tort case. Such a judgment for fees arises from policies designed to protect the judicial process from abuse. Moreover, it has a compensatory character in respect to the services performed by the winning party's attorneys.

### Amount of Award

■ As already described, plaintiffs' suit raised a number of issues in addition to the one concerning fisheries. The non-fisheries issues were disposed of on motion without trial in defendants' favor. Defendants clearly were not in bad faith on the non-fisheries issues. Plaintiffs' recovery of attorneys' fees and disbursements must be limited to the fisheries issue.

Plaintiffs' attorneys have provided a breakdown showing work on the fisheries issue, except in connection with the appeal. As to the appeal, it can be safely estimated that at least two-thirds of the time spent and of the disbursements related to the fisheries issue.

As to the work of plaintiffs' attorneys leading up to the two trials and during the trials, the attorneys have furnished a detailed description of the work carried out and the hours spent on the fisheries issue. They have shown separately the work in connection with the first trial against the Corps defendants and the State defendant, and the work in connection with the second trial against the FHWA defendants and the State defendant.

They have calculated amounts for each trial based on the number of hours and standard hourly rates for the attorneys involved. The rates are in all cases reasonable. The amount in connection with the first trial is $155,870 plus disbursements of $21,245. The latter figure includes $8,400 for an expert witness. The amount in connection with the second trial is $76,335 plus disbursements of $5,004. The amount for the appeal (before deducting for non-fisheries issues) is $43,025. Plaintiffs have also shown disbursements of $4,180 for the appeal and certain other activities. Using the estimate of two-thirds for the fisheries related work, the amount for the appeal is $29,000 plus $2,800 disbursements.

■ Plaintiffs contend that a multiplier or premium should be applied to the above figures. Plaintiffs suggest that an appropriate multiplier is 2. Plaintiffs cite two cases. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir.1976); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974). However, these were antitrust class actions, and did not involve an award of attorneys' fees based on bad faith. Plaintiffs have cited no cases involving the latter type of award where a multiplier was used.

Judging from the citations provided by the parties here, the question of whether to apply a multiplier in a bad faith fee award has not been specifically discussed in the cases. However, there is some suggestion that such an award should be limited to the reasonable expenses arising from the bad faith conduct. *See Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1089 (2d Cir.1977); *Wright v. Jackson,* 522 F.2d 955, 958 (4th Cir.1975); *In re National Student Marketing Litiga-*

**1528**

*tion,* 78 F.R.D. 726, 728 n. 3 (D.D.C.1978), *aff'd and remanded,* 663 F.2d 178 (D.C. Cir.1980).

In the present case the court declines to apply a multiplier. It is sufficient for plaintiffs' attorneys to be compensated for their time at regular hourly rates. The effect of defendants' bad faith conduct was to increase the amount of plaintiffs' attorneys' services required for this litigation. The appropriate remedy is to compensate for those services.

■■ The court also declines to award attorneys' fees in connection with the present fee application and work on the State defendant's application for permission to obtain funding for interim work pending the remands to the federal agencies.

■■ This brings us to the final ruling as to liability for attorneys' fees and disbursements. Plaintiffs are entitled to a total award, relating to work on the fisheries issue at the two trials and on the appeal, in the amount of

|  | *Fees* |  |
|---|---|---|
| 1st trial |  | $ 155,870 |
| 2nd trial |  | 76,335 |
| Appeal |  | 29,000 |
|  |  | $ 261,205 |
|  | *Disbursements* |  |
| 1st trial |  | $ 21,245 |
| 2nd trial |  | 5,004 |
| Appeal |  | 2,800 |
|  |  | $ 29,049 |

Since the State defendant participated in both trials and appealed the fisheries rulings, as described above, the State defendant is liable for the entire fee award of $261,205 and disbursements of $29,049, or a total of $290,254.

However, each group of federal defendants is liable for a lesser amount. The Corps defendants participated only in the first trial and did not appeal the fisheries rulings. Therefore the Corps defendants are liable for fees in the amount of $155,870 and disbursements of $21,245, or a total of $177,115. The FHWA defendants participated only in the second trial and did not appeal the fisheries rulings. Therefore the FHWA defendants are liable for fees in

the amount of $76,335 and disbursements of $5,004, or a total of $81,339.

Settle judgment.